IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-140-D

SOFTWARE AUTOMATION )
HOLDINGS, INC., )
                                          )
             Plaintiff, )
                                          )                    **ORDER**
             v. )
                                          )
INSURANCE TOOLKITS, LLC, et al., )
                                          )
            Defendants. )

On March 17, 2023, Software Automation Holdings, Inc. ("Software Automation" or "plaintiff") filed an action against Insurance Toolkits, LLC ("Insurance Toolkits"), Frankie Primerano ("Primerano"), Joseph Wahl ("Wahl"), and John Does 1–10 ("Does") (collectively, "defendants") for (1) breach of contract, (2) tortious interference with contract, (3) misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, (4) misappropriation of trade secrets in violation of North Carolina law, (5) unfair competition in violation of 25 U.S.C. § 1125(a), (6) copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 101, et seq., (7) intentional interference with prospective business advantage, (8) unfair and deceptive trade practices ("UDTPA"), (9) civil conspiracy, and (10) fraud. See Compl. [D.E. 1, p. 1–22] ¶¶ 97–214. On June 12, 2023, defendants moved to dismiss the complaint for lack of personal jurisdiction over Primerano and in part for failure to state a claim for tortious interference with contract, misappropriation of trade secrets under the Defend Trade Secrets Act, misappropriation of trade secrets under North Carolina law, unfair competition, intentional interference with prospective business advantage, unfair and deceptive trade practices, and civil

conspiracy [D.E. 14] and filed a memorandum in support [D.E. 15]. See Fed. R. Civ. P. 12(b)(2), (6). On July 21, 2023, Software Automation responded in opposition [D.E. 18]. On August 3, 2023, defendants replied [D.E. 20].

On November 17, 2023, after a hearing, the court dismissed Primerano for lack of personal jurisdiction and dismissed Software Automation's tortious interference with contract, unfair competition, intentional interference with prospective business advantage, and civil conspiracy claims [D.E. 24].

On January 8, 2024, defendants answered, filed a third-party complaint against Zachary Bornheimer ("Bornheimer"), and filed counterclaims against Software Automation and Bornheimer for (1) libel per se, (2) libel per quod, and (3) unfair and deceptive trade practices. See Countercl. [D.E. 25, p. 23–32] ¶¶ 23–56. On February 12, 2024, Software Automation and Bornheimer moved to dismiss defendants' third-party complaint and counterclaims [D.E. 29]. See Fed. R. Civ. P. 12(b)(2), (6). On March 7, 2024, defendants responded in opposition [D.E. 31]. On April 4, 2024, Software Automation and Bornheimer replied [D.E. 33]. As explained below, the court dismisses without prejudice Bornheimer for lack of personal jurisdiction and dismisses without prejudice for failure to state a claim defendants' libel per quod and UDTPA counterclaims against Software Automation. Defendants' libel per se counterclaim against Software Automation survives.

I.

Software Automation is a limited liability company incorporated in North Carolina with its principal place of business in Cary, North Carolina. See Countercl. ¶ 3. Software Automation provides automated underwriting software, creating and selling Best Plan Pro ("BPP"), a pay-to-use software for life and health insurance marketing. See Compl. ¶¶ 2, 14. BPP provides insurance

agents with recommendations for insurance carriers, insurance plans, quotes for insurance, and plan recommendations using proprietary algorithms, artificial intelligence, and proprietary databases developed through industry research on insurance carriers' products and underwriting criteria. See id. at ¶ 18. BPP operates by processing and grouping this data in unique databases by using proprietary connections between medications and conditions, brand-name medications and generic medications, and a database of medication misspellings and corrections with a specific insurance underwriter's evaluation criteria. See id. at ¶¶ 19–21. Based on the user's input, BPP makes underwriting risk predictions and product recommendations, and during the data input stage, it also makes suggestions for inputting other related conditions and medications, creating tailored results. See id. at ¶¶ 22–23.

Primerano and Wahl founded Insurance Toolkits, which also markets underwriting software programs. See id. at ¶¶ 11–12, 32. Software Automation alleges that Insurance Toolkits stole Software Automation's technological elements, promotional slogans, and interface through improper data procurement with the intent to confuse the consumer and engage in unfair competition with BPP. See id. at ¶¶ 32–36. Software Automation alleges that numerous accounts with fictitious user information (e.g., names, addresses, emails, and prepaid giftcards with insufficient funds) were linked to Wahl, and Wahl and various John Does used these accounts to gain access to the BPP system in violation of the End User Licensing Agreement ("EULA") to steal information through data scraping and program duplication for Insurance Toolkits. See id. at ¶¶ 36–77. In 2020, Wahl told Bornheimer he did not copy or extract BPP's code and explained the differences between BPP and his software. See Countercl. ¶ 16. Bornheimer responded that it took ten different coding languages to create BPP and acknowledged that Wahl could not have

3

accessed BPP's code. See id. On March 17, 2023, Software Automation filed its complaint. See [D.E. 1].

Bornheimer is the CEO of Software Automation. See Countercl. ¶¶ 4, 7; [D.E. 25-1] 2. He lives in Saint Petersburg, Florida. See Countercl. ¶ 4. On March 22, 2023, he acquired the website toolkitfraudsuit.com ("website"). See id. at ¶ 11. On April 11, 2023, Software Automation issued a press release concerning Software Automation's allegations against Insurance Toolkits. See id. at ¶ 12; [D.E. 25-4] 2–3. The same day, Bornheimer announced on his personal Facebook account that Software Automation was suing Insurance Toolkits. See Countercl. ¶ 13; [D.E. 25-5] 2–3. The Facebook post states:

> The truth always comes out. [BPP] is suing Insurance Toolkits "[Software Automation] alleges Insurance Toolkits and its founders, [Wahl] and [Primerano], knowingly created fake user accounts using fictitious names and credit card information to gain access to the [BPP] software[,] and, over several months, utilized these fake accounts to extract source code and data from [BPP's] databases[.]" It is said that [i]f it mattes to you, you should speak up. Fight for the little guy. Well, this matters to me[,] and I want the truth known. I'm just grateful today that good always wins[,] and the truth always comes out. Now I am very excited to share a little bit more about my story and the journey of [BPP] throughout the year as we put all efforts into making it easier for agents to make more money and find the right coverage faster. (Lawsuit Article in comments)[.]

[D.E. 25-5] 3 (emphasis omitted). After posting, Bornheimer responded to various comments, expounding on his position when various commenters disputed the lawsuit's merits. See Countercl. ¶¶ 14–15; [D.E. 25-5] 4–7. Additionally, Bornheimer alleges that defendants "admitted" to the "wrongdoing." [D.E. 25-5] 5; see Countercl. ¶ 18. On April 18, 2023, Bornheimer posted the complaint's allegations on the website and a statement from Software Automation's managing director. See Countercl. ¶ 11; [D.E. 25-3] 2. On December 18, 2023, Software Automation and Bornheimer revised the website, eliminating the statement that Wahl "'extracted' or otherwise copied . . . BPP's 'source code,'" only accusing Insurance Toolkits of

4

extracting data from BPP. Countercl. ¶ 17; compare [D.E. 25-3] 2, with [D.E. 25-6] 2. Defendants allege that Software Automation and Bornheimer's conduct created distress, embarrassment, injury to moral character, and injury to professional, business, and personal reputations. See Countercl. ¶ 21.

II.

Software Automation and Bornheimer move to dismiss defendants' counterclaims for lack of personal jurisdiction over Bornheimer. See [D.E. 29]; Fed. R. Civ. P. 12(b)(2). Personal jurisdiction over a nonresident defendant must comport with North Carolina's long-arm statute and the Fourteenth Amendment's Due Process Clause. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). North Carolina's long-arm statute extends personal jurisdiction over a nonresident defendant consistent with the Fourteenth Amendment's Due Process Clause. See Christian Sci. Bd. of Dirs. v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). Thus, the statutory inquiry merges with the constitutional inquiry. See id.; Atl. Corp. of Wilmington, Inc. v. TBG Tech Co., 565 F. Supp. 3d 748, 759 (E.D.N.C. 2021).

Due process requires a defendant to have "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414 (1984) (alteration and quotations omitted). The minimum contacts analysis considers "the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quotation omitted); see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 358–60 (2021); Bristol-Myers Squibb Co. v. Super. Ct., 582 U.S. 255, 264 (2017). This analysis ensures that a defendant is not haled into a court's jurisdiction "solely as a result of random, fortuitous, or attenuated

5

contacts." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quotations omitted); see Ford Motor Co., 592 U.S. at 359.

The minimum contacts analysis focuses on whether a defendant "purposefully directed his activities at residents of the forum" and whether the causes of action arise out of or relate to those activities. Burger King, 471 U.S. at 472 (quotation omitted); see Ford Motor Co., 592 U.S. at 359; Bristol-Myers Squibb, 582 U.S. at 262; ALS Scan, Inc. v. Digit. Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002); Atl. Corp., 565 F. Supp. 3d at 760. If a defendant's contacts with the state are the basis for the counterclaim, specific jurisdiction may exist. See ALS Scan, 293 F.3d at 712. In determining specific jurisdiction, the court considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (alteration and quotations omitted). Thus, the "constitutional touchstone" of specific personal jurisdiction "remains whether the defendant purposefully established minimum contacts in the forum State." Burger King, 471 U.S. at 474 (quotation omitted); see Bristol-Myers Squibb, 582 U.S. at 264–66; Walden, 571 U.S. at 284–91.

First, in analyzing the extent to which a defendant purposefully availed itself of the privilege of conducting activities within a State, a court examines "various non-exclusive factors" including:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and

(8) the nature, quality, and extent of the parties' communications about the business being transacted.

UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 352 (4th Cir. 2020) (quotation omitted); see Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009); Atl. Corp., 565 F. Supp. 3d at 760.

Second, the claims must have arisen out of or relate to those activities that the defendant directed at the state. See Ford Motor Co., 592 U.S. at 361–71; UMG Recordings, 963 F.3d at 354–55; Atl. Corp., 565 F. Supp. 3d at 760.

Third, the court must analyze whether the exercise of personal jurisdiction is constitutionally reasonable. See Ford Motor Co., 592 U.S. at 368; Bristol-Myers Squibb, 582 U.S. at 262–65; Burger King, 471 U.S. at 476–78; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980); Consulting Eng'rs, 561 F.3d at 279; Atl. Corp., 565 F. Supp. 3d at 760–61. This analysis "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." Consulting Eng'rs, 561 F.3d at 279. Such factors include:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

Id.

Sometimes a non-resident defendant's communications may create personal jurisdiction. "[A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." ALS Scan,

7

293 F.3d at 714. "[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997); see ALS Scan, 293 F.3d at 713–14. "A passive [website] that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." Zippo Mfg., 952 F. Supp. at 1124; see Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 398–401 (4th Cir. 2003); Young v. New Haven Advoc., 315 F.3d 256, 260–63 (4th Cir. 2002); ALS Scan, 293 F.3d at 713–14. Websites or social media profiles that are not specifically tailored for an audience in North Carolina do not support personal jurisdiction in the United States District Court for the Eastern District of North Carolina. See, e.g., Carefirst of Md., Inc., 334 F.3d at 398–401; Young, 315 F.3d at 260–63; ALS Scan, 293 F.3d at 712–15 (collecting cases); Epic Games, Inc. v. Shenzhen Tairuo Tech. Co., 593 F. Supp. 3d 233, 239–44 (E.D.N.C. 2022); Baumgarten v. Belsky, No. GJH-19-374, 2020 WL 3447753, at *3 (D. Md. June 24, 2020) (unpublished); FireClean, LLC v. Tuohy, No. 1:16-CV-294, 2016 WL 3952093, at *4–7 (E.D. Va. July 21, 2016) (unpublished); Pathfinder Software, LLC v. Core Cashless, LLC, 127 F. Supp. 3d 531, 540–44 (M.D.N.C. 2015); Rao v. Era Alaska Airlines, 22 F. Supp. 3d 529, 537–40 (D. Md. 2014).

Generally, "the contacts of a company are not attributed to a corporate agent for jurisdictional purposes." ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 177 (4th Cir. 2002). Rather, corporate officers are subject to personal jurisdiction only if they have "sufficient contacts" with the state, even if those contacts are made on behalf of the corporation. Id. Thus, if the allegations against a non-resident individual defendant rest on "nothing more than" that he is an "officer or employee," personal jurisdiction does not exist over the corporate officer. Columbia Briargate Co.

8

v. First Nat'l Bank in Dall., 713 F.2d 1052, 1064 (4th Cir. 1983); see Thousand Oaks Barrel Co. v. Deep S. Barrels LLC, 241 F. Supp. 3d 708, 718 (E.D. Va. 2017) (holding that personal jurisdiction was not imputed to owners of a company simply because they were owners); Ibekwe v. Blood Oranges, LLC, No. 3:18-CV-89, 2018 WL 2434069, at *4 (W.D.N.C. May 30, 2018) (unpublished).

Bornheimer resides in Saint Petersburg, Florida, not North Carolina. See Countercl. ¶ 4. Insurance Toolkits argues that Bornheimer made contacts with North Carolina as an agent of Software Automation because he held himself out as speaking for Software Automation on its website and in his personal Facebook posts. See [D.E. 31] 26. Software Automation and Bornheimer respond that someone at Software Automation posted about the lawsuit on Software Automation's website with Bornheimer as the contact, someone at Software Automation issued a press release about the lawsuit, and Bornheimer posted on his personal Facebook account about the lawsuit. See Countercl. ¶¶ 12–13; [D.E. 33] 6–7. According to Software Automation and Bornheimer, these facts do not create personal jurisdiction over Bornheimer.

Defendants fail to plausibly allege that Bornheimer had the minimum contacts with North Carolina necessary to exercise personal jurisdiction over Bornheimer. Defendants fail to plausibly allege that Bornheimer purposefully availed himself, either in his personal capacity or as the CEO of Software Automation, to doing business in North Carolina. For example, defendants fail to plausibly allege that Bornheimer solicited or initiated business in North Carolina or made an in-person contact with a North Carolina resident concerning BPP's purchase or use.

In opposition to this conclusion, defendants argue that North Carolina residents liked Bornheimer's Facebook status concerning the lawsuit and that Bornheimer's business solicitation posts in internet forums that North Carolina residents viewed created personal jurisdiction. See

9

[D.E. 31] 29–30; see also [D.E. 31-1, 31-3]. Defendants fail to plausibly allege, however, that Bornheimer directed this activity to North Carolina. Rather, they only allege that Software Automation is based in North Carolina, which does not establish personal jurisdiction over Bornheimer. See, e.g., Epic Games, Inc., 593 F. Supp. 3d at 244; Baumgarten, 2020 WL 3447753, at *3; FireClean, 2016 WL 3952093, at *4–7; Pathfinder Software, 127 F. Supp. 3d at 540–44; Rao, 22 F. Supp. 3d at 537–40. Moreover, defendants fail to plausibly allege that Bornheimer intended to engage in business or other interactions within North Carolina. Instead, Bornheimer used his personal Facebook account to share the lawsuit's allegations and his personal opinion of the lawsuit indiscriminately with the Internet. See Countercl. ¶¶ 11–13; [D.E. 25-3] 2; [D.E. 25-4] 2–3; [D.E. 25-5] 2–7; [D.E. 25-6] 2; see, e.g., Carefirst of Md., Inc., 334 F.3d at 398–401; Young, 315 F.3d at 260–63; ALS Scan, 293 F.3d at 713–14; Zippo Mfg. Co., 952 F. Supp. at 1124.

Defendants fail to plausibly allege that this court has personal jurisdiction over Bornheimer. Accordingly, the court dismisses without prejudice Bornheimer from this action.

III.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of

10

Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a party's factual allegations must "nudge[] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

For these three counterclaims, this court must predict how the Supreme Court of North

Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). First, the court looks to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (cleaned up). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 630 & n.8 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (cleaned up); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A.

Defendants allege that Software Automation made statements constituting libel per se and libel per quod. See Countercl. ¶¶ 23–51. To establish a defamation claim under North Carolina law, a "plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." Griffin v. Holden, 180 N.C. App. 129, 133, 636 S.E.2d 298, 302 (2006) (quotation omitted); see Desmond v. News & Observer Publ'g Co., 375 N.C. 21, 41–44, 846 S.E.2d 647, 661–62 (2020); Hendrix v. Town of W. Jefferson, 273 N.C. App. 27, 32, 847 S.E.2d 903, 907 (2020); Boyce & Isley, PLLC v. Cooper, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011);

12

Case 5:23-cv-00140-D-RJ   Document 34   Filed 07/03/24   Page 12 of 20

Craven v. Cope, 188 N.C. App. 814, 816, 656 S.E.2d 729, 732 (2008); Smith-Price v. Charter Behav. Health Sys., 164 N.C. App. 349, 356, 595 S.E.2d 778, 783 (2004); see also Johnson v. Town of Smithfield, No. 5:23-CV-349, 2024 WL 1336466, at *28 (E.D.N.C. Mar. 28, 2024) (unpublished); Syngenta Crop Prot., LLC v. Atticus, LLC, No. 5:19-CV-509, 2022 WL 842938, at *6 (E.D.N.C. Mar. 21, 2022) (unpublished). A statement is defamatory if it, either directly or by implication, ascribes dishonesty, fraud, lack of integrity, or reprehensible conduct to the subject of the statement. See Flake v. Greensboro News Co., 212 N.C. 780, 785–86, 195 S.E. 55, 60 (1938); Donovan v. Fiumara, 114 N.C. App. 524, 526, 442 S.E.2d 572, 574 (1994); Beane v. Weiman Co., 5 N.C. App. 276, 277, 168 S.E.2d 236, 237 (1969). A defamatory statement "tend[s] to prejudice another in his reputation, office, trade, business, or means of livelihood." Donovan, 114 N.C. App. at 526, 442 S.E.2d at 574 (quotation omitted); see West v. King's Dep't Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1998); Flake, 212 N.C. at 786, 195 S.E. at 60.

Defamation can be either libel or slander. See, e.g., Craven, 188 N.C. App. at 816, 656 S.E.2d at 732; Tallent v. Blake, 57 N.C. App. 249, 251, 291 S.E.2d 336, 339 (1982); cf. Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 323–24, 312 S.E.2d 405, 412–13 (1984). Generally, libel is written and slander is oral. See Aycock v. Padgett, 134 N.C. App. 164, 165, 516 S.E.2d 907, 909 (1999); Tallent, 57 N.C. App. at 251, 291 S.E.2d at 338; cf. Bell v. Simmons, 247 N.C. 488, 494, 101 S.E.2d 383, 388 (1958). North Carolina recognizes three classes of libel— libel per se, libel per quod, and libel by "publications susceptible of two interpretations one of which is defamatory and the other not." Renwick, 310 N.C. at 316, 312 S.E.2d at 408 (quotation omitted); see Arnold v. Sharpe, 296 N.C. 533, 537, 251 S.E.2d 452, 455 (1979); Flake, 212 N.C. at 785, 195 S.E. at 59; Clark v. Clark, 280 N.C. App. 384, 398, 867 S.E.2d 743, 754 (2021); see

13

also Swinney v. Frontier Airlines, Inc., No. 1:19-CV-808, 2020 WL 3868831, at *5 (M.D.N.C. July 9, 2020) (unpublished).

Libel per se is a false written statement communicated to a third party that "tends to impeach a person in that person's trade or profession [or] otherwise tends to subject one to ridicule, contempt or disgrace." Renwick, 310 N.C. at 317, 312 S.E.2d at 408–09; see Syngenta Crop Prot., 2022 WL 842938, at *6; Flake, 212 N.C. at 782, 195 S.E. at 59–60. In evaluating whether a publication constitutes libel per se, a court must analyze whether the publication is defamatory when "stripped of all insinuations, innuendo, colloquium, and explanatory circumstances." Griffin, 180 N.C. App. at 134, 636 S.E.2d at 303; see, e.g., Nucor Corp. v. Prudential Equity Grp., LLC, 189 N.C. App. 731, 736, 659 S.E.2d 483, 487 (2008). Whether a statement is defamatory per se is a question of law. See, e.g., Ellis v. N. Star Co., 326 N.C. 219, 224, 388 S.E.2d 127, 130 (1990). When a plaintiff alleges that statements are defamatory per se, the statements "must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 30–31, 568 S.E.2d 893, 898–99 (2002); see, e.g., Eshelman v. Puma Biotechnology, Inc., 2 F.4th 276, 281–82 (4th Cir. 2021); Renwick, 310 N.C. at 317–18, 312 S.E.2d at 409; Oates v. Wachovia Bank & Tr. Co., 205 N.C. 14, 16, 169 S.E.2d 869, 871 (1933).

"When examining an allegedly defamatory statement, the court must view the words within their full context and interpret them as ordinary people would understand them." Boyce & Isley, 153 N.C. App. at 31, 568 S.E.2d at 899 (quotation omitted); see Renwick, 310 N.C. at 318, 312 S.E.2d at 409. However, "a statement must state or imply a defamatory fact to be actionable." Daniels v. Metro Mag. Holding Co., L.L.C., 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006);

14

see Craven, 188 N.C. App. at 817, 656 S.E.2d at 732. Thus, a statement that is rhetorical hyperbole or "a pure expression of opinion is protected because it fails to assert an actual fact." Daniels, 179 N.C. App. at 539, 634 S.E.2d at 590; see Craven, 188 N.C. App. at 817, 656 S.E.2d at 732.

A statement constitutes libel per quod if it is "not obviously defamatory" but becomes libelous "when considered in connection with innuendo, colloquium, and explanatory circumstances." Flake, 212 N.C. at 785, 195 S.E. at 59; see Ellis, 326 N.C. at 223, 388 S.E.2d at 130; Skinner v. Reynolds, 237 N.C. App. 150, 157, 764 S.E.2d 652, 657 (2014).

In considering a motion to dismiss, a court must "credit the plaintiff's allegation of the factual falsity of a statement." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993); see Gilmore v. Jones, 370 F. Supp. 3d 630, 671 (W.D. Va. 2019). A plaintiff, however, cannot merely allege falsity in "vague, conclusory terms." Chapin, 993 F.2d at 1092; cf. Mayfield v. NASCAR, Inc., 674 F.3d 369, 377 (4th Cir. 2012) (observing that "the usual standards of notice pleading apply in defamation cases" (quotation omitted)); Hatfill v. N.Y. Times Co., 416 F.3d 320, 329 (4th Cir. 2005); Jolly v. Acad. Collection Serv., Inc., 400 F. Supp. 2d 851, 861 (M.D.N.C. 2005).

Defendants plausibly allege that Software Automation made statements on its website and in its press release to third parties. See Cannon v. Peck, 36 F.4th 547, 559 (4th Cir. 2022); Countercl. ¶¶ 24–25, 28–33; [D.E. 25-3, 25-4; 25-6].[1] Software Automation stated that defendants "created fake user accounts using fictitious names and credit card information" to "extract source

---

[1] Defendants allege that Software Automation and Bornheimer "wrote, printed, caused to be printed, and possessed in printed form the Facebook [c]omments" for a post concerning defendants. See Countercl. ¶ 26. There are only Facebook comments from Bornheimer with no allegations linking those posts to Software Automation. See [D.E. 25-5]. Accordingly, any allegations concerning Bornheimer's Facebook comments and Software Automation fail to state a claim.

15

code and data" from BPP's databases to "improperly create and sell their own software." [D.E. 25-3] 2; see [D.E. 25-4] 2; [D.E. 25-6] 2. The "single interpretation" of these statements is that defendants, who are software developers, duplicitously copied source code and data from Software Automation, a competitor. Cannon, 36 F.4th at 560 (quotation omitted); see [D.E. 25-3] 2; [D.E. 25-4] 2; [D.E. 25-6] 2. Defendants plausibly allege that these statements are false. See Countercl. ¶¶ 15–17. Moreover, these statements "tend[] to impeach" defendants in their "trade or profession." Cannon, 36 F.4th at 561 (quotation omitted); see Eshelman, 2 F.4th at 281–82; Renwick, 310 N.C. at 317, 312 S.E.2d at 409; Badame v. Lampke, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955) (statements accusing a competitor of engaging in "shady deals" were libel per se). Accordingly, defendants plausibly allege libel per se.

Software Automation initially responds that absolute privilege protects its statements. See [D.E. 29-1] 20–22. "Absolute privilege appropriately protects statements asserted in a pleading filed with the trial court and invoking judicial process." Topping v. Meyers, 270 N.C. App. 613, 624, 842 S.E.2d 95, 103 (2020); see Bouvier v. Porter, 900 S.E.2d 838, 847 (N.C. 2024). "Statements made outside the proceeding to the public or media representatives at a press conference, even those averments that 'mirror' allegations made in a filed complaint," however, do not fall under this absolute privilege. Topping, 270 N.C. App. at 624, 842 S.E.2d at 103; see Bouvier, 900 S.E.2d at 847.

Although some of Software Automation's statements merely summarize legal pleadings, Software Automation made various other statements about the defendants outside the "due course of a judicial ... proceeding." Bouvier, 900 S.E.2d at 847; see [D.E. 25-3] 2; [D.E. 25-4] 2. Thus, absolute privilege does not protect those statements. See, e.g., Bouvier, 900 S.E.2d at 847; Topping, 270 N.C. App. at 624, 842 S.E.2d at 103.

16

Alternatively, Software Automation argues that qualified privilege protects those statements. See [D.E. 29-1] 22. "[Q]ualified or conditional privilege arises in circumstances where (1) a communication is made in [g]ood faith, (2) the subject and scope of the communication is one in which the party uttering it has a valid interest to uphold, or in reference to which he has a legal right or duty, and (3) [t]he communication is made to a person or persons having a corresponding interest, right, or duty." Presnell v. Pell, 298 N.C. 715, 720, 260 S.E.2d 611, 614 (1979). The counterclaim itself must describe "an occasion of qualified privilege." Id., 260 S.E.2d at 614.

Software Automation shared its press release and website indiscriminately. Thus, Software Automation fails to plausibly allege a qualified privilege. See id., 260 S.E.2d at 614.

As for Software Automation's statements causing injury to defendants, defendants allege they "have suffered presumed and actual damages in excess of [$75,000], proximately caused by [Software Automation], as a result of their defamation of [defendants], in a specific amount to be proven" at trial. Countercl. ¶ 35. Defendants allege that Software Automation's statements caused defendants "actual damages" and "distress, embarrassment, injury to moral character, and injury to reputation" and "impugned" defendants' profession and business and thereby entitles them to an award of presumed damages. Id. at ¶ 21.

"When an unauthorized publication is libelous per se, malice and damage are presumed from the fact of publication and no proof is required as to any resulting injury." Flake, 212 N.C. at 785, 195 S.E. at 59. Thus, defendants plausibly allege libel per se. See id., 195 S.E. at 59; Eshelman, 2 F.4th at 283–85; Eli Rsch, Inc. v. United Commc'ns Grp., LLC, 312 F. Supp. 2d 748, 761 (M.D.N.C. 2004) (holding that libel per se "obviate[es] the need for the plaintiff to plead and prove special damages"). In contrast, "[t]o state a claim for libel per quod, a party must specifically

17

allege . . . special damages as to each plaintiff." Skinner, 237 N.C. App. at 157, 764 S.E.2d at 658 (quotation omitted). Defendants' conclusory allegations do not plausibly allege special damages. See, e.g., id., 764 S.E.2d at 658. Accordingly, the court dismisses without prejudice defendants' libel per quod claim against Software Automation but denies Software Automation's motion to dismiss defendants' libel per se claim.

In opposition to this conclusion concerning their libel per quod claim, defendants cite Johnson v. Bollinger, 86 N.C. App. 1, 11–12, 356 S.E.2d 378, 385 (1987). See [D.E. 31] 21–22. In Johnson, the plaintiff alleged damage to his trade or business and loss of business income "in the sum of $20,000." Johnson, 86 N.C. App. at 11, 356 S.E.2d at 385 (emphasis removed). In contrast, defendants' allegations are nothing "more than . . . unadorned, the-defendant-unlawfully-harmed-me accusation[s]" paired with the jurisdictional minimum amount-in-controversy. Iqbal, 556 U.S. at 678. Accordingly, defendants fail to plausibly allege libel per quod.

B.

Defendants allege that Software Automation engaged in unfair and deceptive trade practices. See Countercl. ¶¶ 52–56. To state a UDTPA claim, defendants must plausibly allege: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to the defendants. See Barbour v. Fid. Life Ass'n, 361 F. Supp. 3d 565, 573 (E.D.N.C. 2019); Kelly v. Georgia-Pac. LLC, 671 F. Supp. 2d 785, 798 (E.D.N.C. 2009); SciGrip, Inc. v. Osae, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020); Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007). "[W]hether an act or practice is an unfair or deceptive practice . . . is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000); see ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 123 (4th Cir. 2006). "[A] practice is deceptive if it has the tendency

18

to deceive. ... [A] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Gray, 352 N.C. at 68, 529 S.E.2d at 681 (quotation omitted); see Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

Defendants incorporate by reference Software Automation's alleged libel as an unfair or deceptive trade practice. See Countercl. ¶ 53. "In a business setting, libel per se is an unfair or deceptive act in or affecting commerce in violation of N.C.G.S. § 75-1.1, which will justify an award of damages under N.C.G.S. § 75-16 for injuries proximately caused." Brown v. Brown, No. 3:23-CV-230, 2023 WL 6367669, at *8 (W.D.N.C. Sept. 29, 2023) (unpublished) (quotation omitted); see Ellis, 326 N.C. at 225–26, 388 S.E.2d at 131. "To recover, however, a plaintiff must have suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." Ellis, 326 N.C. at 226, 388 S.E.2d at 131 (quotation omitted). In other words, libel per se fulfills just the first two elements of a plaintiff's prima facie UDTPA claim. A plaintiff still must allege damages, and presumed damages do not suffice. See, e.g., Taylor v. United States, No. 7:11-CV-268, 2012 WL 5928269, at *5 (E.D.N.C. Nov. 26, 2012) (unpublished); Exclaim Mktg., LLC v. DIRECTV, Inc., No. 5:11-CV-684, 2012 WL 3023429, at *9 (E.D.N.C. July 24, 2012) (unpublished); Mkt. Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 157, 520 S.E.2d 570, 580 (1999); Ausley v. Bishop, 133 N.C. App. 210, 216–17, 515 S.E.2d 72, 77 (1999) (holding that slander per se is an unfair and deceptive trade practice, then considering whether the plaintiff established "actual injury to himself or his business proximately caused by the unfair or deceptive act or practice").

As discussed, defendants plausibly allege libel per se. Defendants, however, do not plausibly allege injury to themselves. Accordingly, the court dismisses without prejudice defendants' UDTPA counterclaim.

IV.

In sum, the court GRANTS IN PART and DENIES IN PART the motion to dismiss of Software Automation and Zachary Bornheimer [D.E. 29], DISMISSES WITHOUT PREJUDICE Bornheimer from the action for lack of personal jurisdiction, and DISMISSES WITHOUT PREJUDICE for failure to state a claim upon which relief can be granted defendants' libel per quod and UDTPA counterclaims against Software Automation. Defendants' libel per se counterclaim against Software Automation survives.

SO ORDERED. This _3_ day of July, 2024.

                                              JAMES C. DEVER III
                                              United States District Judge