IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-140-D

SOFTWARE AUTOMATION     )
HOLDINGS, INC.,     )
     )
     Plaintiff,     )
     )     **ORDER**
     v.     )
     )
INSURANCE TOOLKITS, LLC, et al.,     )
     )
     Defendants.     )

On March 17, 2023, Software Automation Holdings, Inc. ("Software Automation" or "plaintiff") filed an action against Insurance Toolkits, LLC ("Insurance Toolkits"), Frankie Primerano ("Primerano"), Joseph Wahl ("Wahl"), and John Does 1–10 ("Does") (collectively, "defendants") for (1) breach of contract ("count one"), (2) tortious interference with contract ("count two"), (3) damages for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, ("DTSA") 18 U.S.C. § 1836 ("count three"), (4) injunctive relief under the DTSA ("count four"), (5) damages for misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. §§ 66-152 et seq., ("count five"), (6) injunctive relief under the TSPA ("count six"), (7) unfair competition in violation of 25 U.S.C. § 1125(a) ("count seven"), (8) copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 101, et seq. ("count eight"), (9) intentional interference with prospective business advantage ("count nine"), (10) unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, ("UTDPA") N.C. Gen. Stat. §§ 75-1.1 et seq. ("count ten"), (11) civil conspiracy ("count eleven"), and (12) fraud ("count twelve"). See Compl. [D.E. 1] ¶¶ 97–214. On June 12, 2023, defendants moved to dismiss the complaint for lack of personal

jurisdiction over Primerano and in part for failure to state a claim for tortious interference with contract, misappropriation of trade secrets under the DTSA, misappropriation of trade secrets under North Carolina law, unfair competition, intentional interference with prospective business advantage, unfair and deceptive trade practices, and civil conspiracy [D.E. 14] and filed a memorandum in support [D.E. 15]. See Fed. R. Civ. P. 12(b)(2), (6). On July 21, 2023, Software Automation responded in opposition [D.E. 18]. On August 3, 2023, defendants replied [D.E. 20].

On November 17, 2023, after a hearing, the court dismissed Primerano for lack of personal jurisdiction and dismissed Software Automation's claims in counts two, seven, nine, and eleven [D.E. 24].[1] Software Automation's claims in counts one, three, four, five, six, eight, ten, and twelve remain.

On January 8, 2024, defendants answered, filed a third-party complaint against Zachary Bornheimer ("Bornheimer"), and filed counterclaims against Software Automation and Bornheimer for (1) libel per se, (2) libel per quod, and (3) unfair and deceptive trade practices. See Countercl. [D.E. 25] 23–32. On February 12, 2024, Software Automation and Bornheimer moved to dismiss defendants' third-party complaint and counterclaims [D.E. 29]. See Fed. R. Civ. P. 12(b)(2), (6). On March 7, 2024, defendants responded in opposition [D.E. 31]. On April 4, 2024, Software Automation and Bornheimer replied [D.E. 33]. On July 3, 2024, the court dismissed without prejudice Bornheimer for lack of personal jurisdiction, dismissed without prejudice for failure to state a claim defendants' libel per quod and UDTPA counterclaims against Software Automation, and allowed defendants' libel per se counterclaim against Software

---

[1] Despite the court dismissing counts two, seven, nine, and eleven, see [D.E. 24], and Software Automation not filing an amended complaint, Software Automation inexplicably relitigates these dismissed counts in their latest filings. See [D.E. 53] 16. Because the court has dismissed these counts, the court will not consider Software Automation's arguments concerning these counts.

Automation to survive. See Software Automation Holdings, Inc. v. Ins. Toolkits, LLC, No. 5:23-CV-140, 2024 WL 3297138 (E.D.N.C. July 3, 2024) (unpublished).

On July 17, 2024, Software Automation answered defendants' counterclaim and raised several affirmative defenses [D.E. 35]. On October 28, 2024, the court issued a scheduling order [D.E. 39]. The order required the parties to complete all discovery by June 27, 2025. See id. at 1. From fall 2024 through spring 2025, the parties exchanged discovery. On March 24, 2025, the court amended the scheduling order and set fact discovery to close on April 28, 2025 [D.E. 46]. The court later extended the deadlines for fact discovery by three days to allow the parties to complete fact witness depositions [D.E. 63, 64].

On April 1, 2025, after receiving documents concerning Software Automation's apparent assignment of its rights to IIP Group Holdings, Inc. ("IIP Holdings"), defendants moved to dismiss Software Automation's complaint for lack of jurisdiction [D.E. 47] and filed a memorandum in support [D.E. 48]. See Fed. R. Civ. P. 12(b)(1). That same day, defendants moved to expedite briefing on its motion to dismiss [D.E. 50] and filed a memorandum in support [D.E. 51]. On April 2, 2025, the court granted defendants' motion to expedite briefing on the motion to dismiss [D.E. 52].

On April 8, 2025, Software Automation responded in opposition to defendants' motion to dismiss for lack of jurisdiction [D.E. 53]. On April 9, 2025, Software Automation moved for leave to file an amended complaint and to join IIP Holdings under Federal Rules of Civil Procedure 15 and 17 [D.E. 54] and filed a memorandum in support [D.E. 55]. On April 10, 2025, Software Automation moved to expedite briefing on its motion to amend [D.E. 57] and filed a memorandum in support [D.E. 58]. On April 14, 2025, the court granted Software Automation's motion to expedite briefing on its motion to amend [D.E. 62].

3

On April 11, 2025, defendants replied to Software Automation's response in opposition to defendants' motion to dismiss [D.E. 60]. On April 17, 2025, defendants responded in opposition to Software Automation's motion to amend [D.E. 65]. On April 22, 2025, Software Automation replied to defendants' response in opposition to Software Automation's motion to amend [D.E. 68] and filed a declaration in support [D.E. 69].

On April 23, 2025, Software Automation moved to compel defendants to produce source code relevant to Software Automation's infringement claims [D.E. 70] and filed a memorandum [D.E. 71] and exhibits in support [D.E. 72]. On April 28, 2025, the court referred the motion to compel to Magistrate Judge Robert B. Jones, Jr., under 28 U.S.C. § 636(b)(1)(A) [D.E. 73]. That same day, defendants responded in opposition to the motion to compel [D.E. 74].

On May 23, 2025, Software Automation moved to extend the time to file opening expert reports [D.E. 77]. At the time of Software Automation's motion to extend, opening expert reports were due June 2, 2025. See [D.E. 46]. On May 27, 2025, defendants responded in opposition to the motion to extend the time to file opening expert reports [D.E. 78]. On June 11, 2025, Magistrate Judge Jones granted Software Automation's motion to compel and ordered the parties to coordinate Software Automation's inspection of the source code.

As explained below, the court grants defendants' motion to dismiss, denies Software Automation's motion to amend, and denies as moot Software Automation's motion for an extension of time to file opening expert reports. Moreover, not later than July 18, 2025, defendants shall either submit briefing establishing that the court has jurisdiction over their remaining counterclaim or move to voluntarily dismiss their counterclaim.

4

## I.

Software Automation is a limited liability company incorporated in North Carolina with its principal place of business in Cary, North Carolina. See Countercl. ¶ 3. Software Automation provides automated underwriting software, creating and selling Best Plan Pro ("BPP"), a pay-to-use software for life and health insurance marketing. See Compl. ¶¶ 2, 14. BPP provides insurance agents with recommendations for insurance carriers, insurance plans, quotes for insurance, and plan recommendations using proprietary algorithms, artificial intelligence, and proprietary databases developed through industry research on insurance carriers' products and underwriting criteria. See id. at ¶ 18. BPP operates by processing and grouping this data in unique databases. See id. at ¶ 19. BPP uses proprietary connections between medications and conditions, brand-name medications and generic medications, and a database of medication misspellings and corrections with a specific insurance underwriter's evaluation criterion. See id. at ¶¶ 19–21. Based on the user's input, BPP makes underwriting risk predictions and product recommendations, and during the data input stage, it also makes suggestions for inputting related conditions and medications, creating tailored results. See id. at ¶¶ 22–23.

Primerano and Wahl founded Insurance Toolkits, which also markets underwriting software programs. See id. at ¶¶ 11–12, 32. Software Automation alleges that Insurance Toolkits stole Software Automation's technological elements, promotional slogans, and interface through improper data procurement with the intent to confuse the consumer and engage in unfair competition with BPP. See id. at ¶¶ 32–36. Software Automation alleges that numerous accounts with fictitious user information (e.g., names, addresses, emails, and prepaid giftcards with insufficient funds) were linked to Wahl, and Wahl and various John Does used these accounts to gain access to the BPP system in violation of the End User Licensing Agreement ("EULA") to

5

steal information through data scraping and program duplication for Insurance Toolkits. See id. at ¶¶ 36–77. In 2020, Wahl told Bornheimer he did not copy or extract BPP's code and explained the differences between BPP and his software. See Countercl. ¶ 16. Bornheimer responded that it took ten different coding languages to create BPP and acknowledged that Wahl could not have accessed BPP's code. See id. On March 17, 2023, Software Automation filed its complaint. See [D.E. 1].

Bornheimer is the CEO of Software Automation. See Countercl. ¶¶ 4, 7; [D.E. 25-1] 2. On March 22, 2023, he acquired the website toolkitfraudsuit.com ("website"). See id. at ¶ 11. On April 11, 2023, Software Automation issued a press release concerning Software Automation's allegations against Insurance Toolkits. See id. at ¶ 12; [D.E. 25-4] 2–3. The same day, Bornheimer announced on his personal Facebook account that Software Automation was suing Insurance Toolkits. See Countercl. ¶ 13; [D.E. 25-5] 2–3. The Facebook post states:

> The truth always comes out. [BPP] is suing Insurance Toolkits "[Software Automation] alleges Insurance Toolkits and its founders, [Wahl] and [Primerano], knowingly created fake user accounts using fictitious names and credit card information to gain access to the [BPP] software, and, over several months, utilized these fake accounts to extract source code and data from [BPP's] databases." It is said that [i]f it matters to you, you should speak up. Fight for the little guy. Well, this matters to me, and I want the truth known. I'm just grateful today that good always wins, and the truth always comes out. Now I am very excited to share a little bit more about my story and the journey of [BPP] throughout the year as we put all efforts into making it easier for agents to make more money and find the right coverage faster. (Lawsuit Article in comments).

[D.E. 25-5] 3 (emphasis omitted). After posting, Bornheimer responded to various comments, expounding on his position when various commenters disputed the lawsuit's merits. See Countercl. ¶¶ 14–15; [D.E. 25-5] 4–7. Additionally, Bornheimer alleges that defendants "admitted" to the "wrongdoing." [D.E. 25-5] 5; see Countercl. ¶ 18. On April 18, 2023, Bornheimer posted the complaint's allegations on the website and a statement from Software

6

Automation's managing director. See Countercl. ¶ 11; [D.E. 25-3] 2. On December 18, 2023, Software Automation and Bornheimer revised the website, eliminating the statement that Wahl "'extracted' or otherwise copied . . . BPP's 'source code,'" only accusing Insurance Toolkits of extracting data from BPP. Countercl. ¶ 17; compare [D.E. 25-3] 2, with [D.E. 25-6] 2. Defendants allege that Software Automation and Bornheimer's conduct created distress, embarrassment, injury to moral character, and injury to professional, business, and personal reputations. See Countercl. ¶ 21. On July 3, 2024, the court dismissed Bornheimer for lack of personal jurisdiction, dismissed defendants' counterclaims under the UDTPA and for libel per quod, and permitted defendants' counterclaim for libel per se to proceed. See Software Automation Holdings, 2024 WL 3297138, at *10.

On April 1, 2025, defendants moved to dismiss Software Automation's complaint for lack of jurisdiction. See [D.E. 47]. Defendants' motion to dismiss arises from documents it received in the waning days of fact discovery. Defendants argue that on October 28, 2024, defendants served Software Automation with its first set of document requests, which included a request for "assignment and ownership documents for BPP." [D.E. 48] 10; [D.E. 48-1] Nos. 40, 54. On December 27, 2024, Software Automation served only objections and promised to produce certain documents. See [D.E. 48] 10; [D.E. 48-5]. On January 2, 2025, counsel for defendants emailed counsel for Software Automation and raised concerns over Software Automation responses to defendants' requests for discovery. See [D.E. 48] 10; [D.E. 48-6]. The parties continued to communicate concerning discovery. On January 24, 2025, Software Automation promised to substantially complete document production on February 5, 2025. See [D.E. 48] 10; [D.E. 48-7] 2. Software Automation followed up and pushed the date that defendants should expect document production to February 7, 2025. See [D.E. 48] 10; [D.E. 48-8].

7

On February 7, 2025, Software Automation produced documents. See [D.E. 48] 11. On February 24, 2025, defendants again expressed concerns with Software Automation's document production, including "the absence of assignment and ownership records related to [BPP]." Id.; see [D.E. 48-9] 4–5.

On March 3, 2025, counsel for defendants again emailed counsel for Software Automation and summarized specific documents defendants believed that Software Automation had failed to produce, including "assignment records." [D.E. 48] 11; see [D.E. 48-10] 2–3. On March 21, 2025, Software Automation produced assignment and ownership records concerning BPP and its associated intellectual property. See [D.E. 48] 11.

The assignment and ownership records show that on July 27, 2022, Bornheimer assigned all his rights in BPP and its associated intellectual property to Software Automation. See [D.E. 48-11] 2–6. Specifically, Bornheimer assigned all patent, trademark, copyright, domain name, and other intellectual property as defined in Schedule I of the assignment to Software Automation. See id. at 2–3, 5. Schedule I included Bornheimer's interest in United States Copyright Registration No. TX0008754771, the registration that Software Automation asserts covers the BPP code. See id. at 5. Bornheimer also assigned to Software Automation all unregistered copyrights and trade secrets in BPP's software and user interfaces. See id. at 5–6. Moreover, Bornheimer assigned to Software Automation "any and all claims and causes of action with respect to" BPP and its associated intellectual property, "including all rights to claims and for damages . . . and injunctive and other legal and equitable relief . . . for misappropriation, violation, misuse, breach, or default, with the right but no obligation to such equitable relief." Id. at 3.

The assignment and ownership records also establish that on July 28, 2022, Software Automation executed a Membership Interest Purchase Agreement ("MIPA") in which IIP Holdings

8

became the majority owner of Software Automation.  See [D.E. 48-12] 2–39.  In the MIPA,

Software Automation assigned to IIP Holdings all rights, title, and interest to all of Software

Automation's intellectual property and related causes of action.  Sections K, L, and M of the MIPA

broadly define the scope of Software Automation's assignment of intellectual property to IIP

Holdings:

> K.) "Intellectual Property" means all intellectual property and industrial property
> rights and assets, and all rights, interests and protections that are associated with or
> required for the exercise of, and including any and all: (a) trademarks, service
> marks, trade names, brand names, logos, design rights and other similar
> designations of source, sponsorship, association or origin, together with the
> goodwill connected with the use of, and all registrations, applications and renewals
> for, any of the foregoing; (b) internet domain names, whether or not trademarks,
> registered in any top-level domain by any authorized private registrar or
> Governmental Entity, web addresses, web pages, websites and related content,
> accounts with Twitter, Facebook and other social media; (c) software and firmware,
> including data files, source code, object code, application programming interfaces,
> architecture, files, records, schematics, computerized databases and other related
> specifications and documentation; and (d) any and all royalties, fees, income,
> payments and other proceeds now or hereafter due or payable with respect to any
> and all of the foregoing.
>
> L.) "Intellectual Property Assets" means all Intellectual Property that is owned by
> Zach Bornheimer or SAH and used in or necessary for the conduct of SAH business
> as currently conducted.
>
> M.) "Intellectual Property Registrations" means all Intellectual Property Assets that
> are subject to any issuance, registration, application or other filing with any
> Governmental Entity or private registrar.

Id. at 4–5.

The MIPA also contains the same schedule of intellectual property interests as included in

the Bornheimer assignment, although the MIPA refers to the schedule as Exhibit F.  Compare [D.E.

48-11] 5 with [D.E. 48-12] 30.  Exhibit F includes the United States Copyright Registration No.

TX0008754771, Software Automation's interest in bestplanpro.com, and all unregistered

copyrights and trade secrets in BPP's software and user interfaces.  See [D.E. 48-12] 30.  Section

9

3.9 of the MIPA establishes that Software Automation intended to assign its interests in the items

contained in Exhibit F to IIP Holdings. See id. at 9. Furthermore, Section 7 of the MIPA appears

to assign Software Automation's right to sue for defendants' alleged infringement of the copyright

(which Bornheimer purportedly assigned to Software Automation the previous day) to IIP

Holdings:

> 7. PATENT OUTSTANDING ISSUES. Zach Bornheimer has pending before the U.S. Patent and Trademark Office, two applications (#17739663 and #63339212) for Utility Patent Registration for "Systems & Methods for Processing Plans having Data and Conditions Applicable to a Population" and "Methods and Systems to Prevent Credential Piracy" which contain Intellectual Property utilized in the "Best Plan Pro" software, marketed by SAH. Zach Bornheimer believes that Insurance Toolkits, LLC has engaged in activities wherein Insurance Toolkits, LLC has, among other claims, infringed upon Zach Bornheimer's/SAH's trademarks, copyright, inventions and patents to market a competing product called FEXToolkit. Zach Bornheimer has engaged outside legal counsel to provide legal guidance in this matter. It is the position of Zach Bornheimer and SAH not to undertake further action against Insurance Toolkits, LLC until the U.S. Patent and Trademark Office has issued one of the patents filed by Zach Bornheimer. Outside counsel has indicated that based on information to-date, there can be a cause of action available to Zach Bornheimer and/or SAH. In accordance with the IP Assignment Agreement attached hereto as Exhibit J (the "Assignment"), the Buyer will have any rights to all such legal rights or actions against Insurance Toolkits, LLC.

Id. at 16.

Software Automation also disclosed an "Amended and Restated Operating Agreement"

between Software Automation, IIP Holdings, Bornheimer, and Richard Craig. See [D.E. 48-13]

2–11. The Amended and Restated Operating Agreement largely recounts the terms of the MIPA

and states that IIP Holdings "acquire[d] all the rights to software, software codes and all related

intellectual property, as well as any and all other property transferred to [IIP Group] under the

terms of the" MIPA. Id. at 4. Thus, Software Automation's assignment and ownership records

establish that on July 28, 2022, (more than seven months before Software Automation filed its

10

complaint), Software Automation assigned its rights and interests in BPP and associated intellectual property to IIP Holdings.

In light of Software Automation's disclosures, on April 1, 2025, defendants moved to dismiss Software Automation's complaint for lack of standing. See [D.E. 47]; Fed. R. Civ. P. 12(b)(1). Specifically, defendants argue that Software Automation does not own BPP or its related intellectual property and therefore lacks standing to pursue its claims. See [D.E. 48] 15–22. First, defendants argue that the Copyright Act creates a cause of action if "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." Id. at 15 (quoting 17 U.S.C. § 501(b); see 17 U.S.C. § 101. According to defendants, Software Automation "cannot establish that it was the owner of the copyright or claims to enforce the copyright from at least July 28, 2022, forward, and therefore lacks standing for its copyright claims." [D.E. 48] at 16.

Defendants also argue that Software Automation assigned its trade secrets and misappropriation claims before filing its complaint and, therefore, lacks standing to pursue those claims. See id. at 18–20. Specifically, defendants argues that the DTSA provides a private right of action for the "owner" of an allegedly misappropriated secret and, because Software Automation assigned its interests in BPP before filing its complaint, Software Automation cannot establish that it owned an allegedly misappropriated secret after July 28, 2022. See id. at 18. Finally, defendants argue that Software Automation assigned all its legal rights to BPP and related intellectual property in the MIPA and therefore lacks standing to pursue it remaining claims. See id. at 20–22.

In opposition, Software Automation refers to IIP Holdings as its "parent company," admits that it executed the MIPA with IIP, and argues that Software Automation has Article III standing to pursue each claim in its complaint. See [D.E. 53] 4, 10. First, Software Automation argues that

11

it never assigned its breach of contract claim and that, despite its broad language, the MIPA deliberately excluded Software Automation's breach of contract claim. See id. at 10–12. According to Software Automation, it "alone owns the breach of contract claim" and defendants' motion to dismiss the breach of contract claim fails. Id. at 12.

Software Automation also argues that the MIPA does not implicate Software Automation's standing to bring its claims, but that the MIPA does implicate Software Automation's status (or non-status) as the real party in interest under Federal Rule of Civil Procedure 17. See id. at 13–16. Software Automation maintains that although it possesses Article III standing to pursue its claims, Software Automation concedes that it is not the real party in interest under Rule 17, and argues that the court should grant Software Automation leave to join IIP Holdings as plaintiff in the case. See id. at 16; [D.E. 54]. In reply, defendants reassert their argument that Software Automation lacks standing to pursue its claims and argues that, even assuming Software Automation has Article III standing, Software Automation cannot satisfy Federal Rules of Civil Procedure 16(b) and 17's standards for amending the complaint. See [D.E. 60] 8–14.

On April 9, 2025, Software Automation moved to amend its complaint to join IIP Holdings as plaintiff. See [D.E. 54]. In support of its motion, Software Automation argues that it satisfies Rule 17's standard for amending the complaint and that substituting IIP Holdings as plaintiff would remedy the deficiencies in its complaint. See [D.E. 55] 10–14. In opposition, defendants renew their argument that Software Automation lacks standing and cannot satisfy the standards to amend under either Rule 16 or 17. See [D.E. 65] 10–21.

## II.

A motion to dismiss under Rule 12(b)(1) tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better

12

Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); see Fed. R. Civ. P. 12(b)(1). A federal court "must determine that it has subject-matter jurisdiction over [a claim] before it can pass on the merits of that [claim]." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). When considering a Rule 12(b)(1) motion, the court "may consider evidence outside the pleadings without converting the proceeding into one for summary judgment." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005) (quotation omitted); see Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). A plaintiff must establish that this court has subject-matter jurisdiction over its claims. See, e.g., Steel, 523 U.S. at 104; Evans, 166 F.3d at 647; Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). However, "when a defendant asserts that the complaint fails to allege sufficient facts to support subject[-]matter jurisdiction, the . . . court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged [in the complaint and any additional materials]." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009).

A defendant can mount either a facial or a factual attack upon subject-matter jurisdiction. See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc., 892 F.3d 613, 620–21 & n.7 (4th Cir. 2018); Kerns, 585 F.3d at 192; Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). A facial attack asserts that a complaint fails to allege facts upon which to base subject-matter jurisdiction. See Hutton, 892 F.3d at 621 n.7; Adams, 697 F.2d at 1219. The court takes the factual allegations of the complaint as true when a defendant makes a facial challenge to subject-matter jurisdiction. See Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017); Kerns, 585 F.3d at 192; Adams, 697 F.2d at 1219.

Defendants argue Software Automation lacks Article III standing to pursue its claims because on July 28, 2022, Software Automation executed the MIPA and assigned its interest in

13

BPP and associated intellectual property to IIP Holdings. A plaintiff establishes standing by showing: (1) that the plaintiff has "suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" from the court. Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1265 (4th Cir. 1995) (cleaned up); see Diamond Alt. Energy, LLC v. Env't Prot. Agency, 606 U.S. __, 2025 WL 1716141, at *6 (U.S. June 20, 2025); Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024); Tyler v. Hennepin Cnty., 598 U.S. 631, 636 (2023); TransUnion LLC v. Ramirez, 594 U.S. 413, 423–30 (2021); California v. Texas, 593 U.S. 659, 668–69 (2021); Frank v. Gaos, 586 U.S. 485, 491 (2019); Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016); Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); Laufer v. Naranda Hotels, LLC, 60 F.4th 156, 161 (4th Cir. 2023); Nanni v. Aberdeen Marketplace, Inc., 878 F.3d 447, 450 (4th Cir. 2017).

A mere statutory violation is not synonymous with Article III standing. See TransUnion, 594 U.S. at 423–30; Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 652–53 (4th Cir. 2019); see also Frank, 586 U.S. at 493; Spokeo, 578 U.S. at 339. Rather, a plaintiff alleging that a defendant violated its statutory rights must have "a personal stake in the case," which is "the traditional core of standing." Krakauer, 925 F.3d at 653; see Murthy v. Missouri, 603 U.S. 43, 56–58 (2024). Moreover, injury-in-fact requires the plaintiff to demonstrate a "concrete and particularized" harm. Krakauer, 925 F.3d at 653; see Spokeo, 578 U.S. at 340. As for concreteness, the injury must be "real, and not abstract," even if the harm is intangible. Spokeo, 578 U.S. at 340 (quotations

14

omitted); see Curtis v. Propel Prop. Tax Funding, L.L.C., 915 F.3d 234, 240–41 (4th Cir. 2019). Furthermore, "in determining whether a given injury meets the constitutional threshold, [courts] look to both historic practice and the judgment of Congress." Krakauer, 925 F.3d at 653; see TransUnion, 594 U.S. at 424–26; Spokeo, 578 U.S. at 340–41; Lujan, 504 U.S. at 560; Garey v. James S. Farrin, P.C., 35 F.4th 917, 921–22 (4th Cir. 2022). Tangible or intangible injuries can satisfy the requirement of concreteness. See Spokeo, 578 U.S. at 340–41. Nonetheless, "sincere legal, moral, ideological, [or] policy objections" do not create standing. All. for Hippocratic Med., 602 U.S. at 396.

"An Article III court is not a legislative assembly, a town square, or a faculty lounge." Id. at 382. If a plaintiff does not have standing, the court does not have subject-matter jurisdiction to hear the plaintiff's claims. See, e.g., Lujan, 504 U.S. at 560–61; White Tail Park, 413 F.3d at 459; Davis v. Safe Streets USA LLC, 497 F. Supp. 3d 47, 51–55 (E.D.N.C. 2020); Chapman v. CKE Rests. Holdings, Inc., No. 5:19-CV-189, 2020 WL 1230130, at *3–6 (E.D.N.C. Mar. 12, 2020) (unpublished); Payne v. Sears, Roebuck & Co., No. 5:11-CV-614, 2012 WL 1965389, at *2–3 (E.D.N.C. May 31, 2012) (unpublished).

Standing under Article III "is related to, but distinct from" the requirement in Federal Rule of Civil Procedure 17 that every civil action be prosecuted in the name of the real party in interest. Nat'l Credit Union Admin. Bd. v. HSBC Bank U.S. Nat'l Ass'n, 331 F.R.D. 63, 70 n.2 (S.D.N.Y. 2019); see Fed. R. Civ. P. 17(a). In other words, "a party may have Article III standing but nevertheless not be the real party in interest when the party has completely assigned the claim to another." Id. at 70 n.2; see Fund Liq. Holdings LLC v. Bank of Am. Corp., 991 F.3d 370, 381–82 (2d Cir. 2021).

15

Software Automation argues that it has Article III standing to pursue each claim in its complaint. See [D.E. 53] 10–16. Software Automation, however, concedes that for all but its claim for breach of contract, it assigned its rights to IIP Holdings. See id. at 12–16. As for count one (which is premised on defendants' alleged violation of the EULA), Software Automation argues that the MIPA did not assign the breach of contract claim to IIP Holdings.

Software Automation's document production shows that Software Automation received its interests in BPP and the associated intellectual property from Bornheimer on July 27, 2022. See [D.E. 49-11]. Additionally, Software Automation's complaint alleges that defendants' allegedly infringing conduct occurred before July 27, 2022. See Compl. ¶¶ 1–96. In other words, the claims here accrued while Bornheimer possessed the rights to BPP and its associated intellectual property. Any interest or right to legal action that Software Automation purports to have assigned to IIP Holdings on July 28, 2022, (i.e., all claims other than its claim for breach of contract), must have first been assigned to Software Automation by Bornheimer on July 27, 2022. Thus, the court must first determine the effect of the multiple assignments in this case before analyzing Article III standing or Rule 17.

A.

Beginning with Software Automation's federal claims (i.e., counts three, four, and eight), "[l]ike other forms of property ownership, copyright ownership is a 'bundle of discrete rights' regarding the owner's ability to use his property." Davis v. Blige, 505 F.3d 90, 98 (2d Cir. 2007); Faulkner v. Nat'l Geographic Enters., Inc., 409 F.3d 26, 35 (2d Cir. 2005). "The right to prosecute an accrued cause of action for infringement is also an incident of copyright ownership." Davis, 505 F.3d at 99. "A claim ordinarily accrues when an infringing act occurs." Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 670 (2014). "A copyright claim thus arises or accrues when

16

an infringing act occurs." Id. (quotation omitted). Under the federal copyright statue, however, "when a defendant commits successive violations, the statute of limitation runs from each violation." Id. at 671. In other words, "[e]ach wrong gives rise to a discrete claim that accrues at the time the wrong occurs." Id. (cleaned up). The owner of a copyright may "convey his interest in prosecuting accrued causes of action for infringement." Davis, 505 F.3d at 99. Thus, on July 27, 2022, when Bornheimer assigned his interests to Software Automation, Bornheimer's federal law claims for copyright infringement had accrued.

The parties agree that Bornheimer properly assigned his interests in BPP, its associated intellectual property, and Bornheimer's right to sue to defend the copyright to Software Automation on July 27, 2022. Likewise, the court has reviewed the Bornheimer assignment and finds that Bornheimer properly assigned his interests in BPP, its associated intellectual property, and Bornheimer's right to sue to defend the copyright to Software Automation on July 27, 2022. See [D.E. 48-11]. Software Automation alleges that defendants' infringing conduct occurred in 2020. See Compl. ¶¶ 38–20, 43, 50, 52, 62, 64–66. In other words, when defendants allegedly breached the EULA, Bornheimer (not Software Automation) owned BPP, its associated intellectual property, and the right to sue for breach of contract. Cf. Petrella, 572 U.S. at 671. Therefore, on July 27, 2022, Bornheimer properly assigned his breach of contract claim interests and his rights to legal action as to Bornheimer's federal copyright claims.

On July 28, 2022, Software Automation executed the MIPA and purports to have transferred those same interests to IIP Holdings. Tellingly, the MIPA contains the same schedule of intellectual property interests included in Bornheimer's assignment of July 27, 2022, to Software Automation, although the MIPA refers to the schedule as Exhibit F. Compare [D.E. 48-11] 5 with [D.E. 48-12] 30. Exhibit F includes the United States Copyright Registration No.

17

TX0008754771, Software Automation's interest in bestplanpro.com, and all unregistered copyrights and trade secrets in BPP's software and user interfaces. See [D.E. 48-12] 30. Section 3.9 of the MIPA establishes that Software Automation intended to assign its interests in the items contained in Exhibit F to IIP Holdings. See id. at 9. Moreover, Sections K, L, and M of the MIPA broadly define the scope of Software Automation's assignment of intellectual property to IIP Holdings. See id. at 4–5. Furthermore, Section 7 of the MIPA appears to assign to IIP Holdings Software Automation's right to defend the copyright Bornheimer assigned to Software Automation the previous day:

> 7. PATENT OUTSTANDING ISSUES. Zach Bornheimer has pending before the U.S. Patent and Trademark Office, two applications (#17739663 and #63339212) for Utility Patent Registration for "Systems & Methods for Processing Plans having Data and Conditions Applicable to a Population" and "Methods and Systems to Prevent Credential Piracy" which contain Intellectual Property utilized in the "Best Plan Pro" software, marketed by SAH. Zach Bornheimer believes that Insurance Toolkits, LLC has engaged in activities wherein Insurance Toolkits, LLC has, among other claims, infringed upon Zach Bornheimer's/SAH's trademarks, copyright, inventions and patents to market a competing product called FEXToolkit. Zach Bornheimer has engaged outside legal counsel to provide legal guidance in this matter. It is the position of Zach Bornheimer and SAH not to undertake further action against Insurance Toolkits, LLC until the U.S. Patent and Trademark Office has issued one of the patents filed by Zach Bornheimer. Outside counsel has indicated that based on information to-date, there can be a cause of action available to Zach Bornheimer and/or SAH. In accordance with the IP Assignment Agreement attached hereto as Exhibit J (the "Assignment"), the Buyer will have any rights to all such legal rights or actions against Insurance Toolkits, LLC.

Id. at 16. Accordingly, on July 28, 2022, the MIPA assigned Software Automation's interests in BPP and the right to defend the federal copyright to IIP Holdings.

In light of the record, as defendants argue and Software Automation admits, Software Automation is not the real party in interest under Federal Rule of Civil Procedure 17 for purposes of counts three, four, and eight. Software Automation proposes to remedy this problem by joining IIP Holdings as the plaintiff under Federal Rules of Civil Procedure 15 and 17. See [D.E. 54].

18

Under Federal Rule of Civil Procedure 17(a)(1), an "action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). The court, however, "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). "After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Id. Thus, under Rule 17(a)(3), "the original flaw" of the wrong party filing the action "does not doom the litigation: it is subject to cure." Akbar v. Calumet City, 632 Fed. App'x. 868, 871 (7th Cir. 2015) (unpublished).

Courts have construed Rule 17(a)(3) "in light of the Advisory Committee Notes, which state that 'this provision was added simply in the interests of justice and is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.'" Rideau v. Keller Indep. Sch. Dist., 819 F.3d 155, 165 (5th Cir. 2016) (quoting Fed. R. Civ. P. 17(a) Advisory Committee Notes, 1966 Amendment) (internal quotation marks omitted)); see Wieburg v. GTE Sw. Inc., 272 F.3d 302, 308 (5th Cir. 2001). Ratification under Rule 17 applies "only when the plaintiff brought the action in [its] own name as the result of an understandable mistake, because the determination of the correct party to bring the action is difficult." Rideau, 819 F.3d at 165; see Wieburg, 272 F.3d at 308 (collecting cases); 6A Wright & Miller's Federal Practice & Procedure § 1555 (3d ed. 2010) ("Rule 17(a)(3) is designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought.").

In other words, "[a] good-faith, nonfrivolous mistake of law triggers Rule 17(a)(3) ratification, joinder, or substitution." Rideau, 819 F.3d at 166; see Scheufler v. Gen. Host Corp.,

19

126 F.3d 1261, 1270 (10th Cir. 1997); Link Aviation, Inc. v. Downs, 325 F.2d 613, 614–15 (D.C. Cir. 1963); Unzueta v. Steele, 291 F. Supp. 2d 1230, 1234 (D. Kan. 2003). By contrast, "when the determination of the right party to bring the action was not difficult and when no excusable mistake had been made, then Rule 17(a)(3) is not applicable and the action should be dismissed." 6A Wright & Miller's Federal Practice & Procedure § 1555 (3d ed. 2010); Rideau, 819 F.3d at 165– 66. As the United States Court of Appeals for the Eleventh Circuit observed:

> Rule 17 was not promulgated to allow lawyers to file placeholder actions . . . to keep a limitations period open while they investigate their claims and track down the proper parties. If we were to adopt the approach plaintiffs' counsel propose— and thus compel courts to allow substitution any time the real plaintiff is waiting in the wings—we would read this limitation out of existence and enable, in fact encourage, lawyers to file complaints without proper authorization or investigation. Such a result would run counter not only to the policy underpinnings of Rule 17, but also those of Rule 11, and would, in a very real sense, obstruct the district courts' ability to administer justice to litigants waiting for their cases to be heard.

In re Engle Cases, 767 F.3d 1082, 1113–14 (11th Cir. 2014).

In addition to Rule 17's understandable mistake standard, Software Automation also must satisfy the requirements of Federal Rules of Civil Procedure 15 and 16. See [D.E. 39] 2 ("[M]otions to join additional parties and to amend pleadings must be made promptly after the information giving rise to the motion becomes known to the party or counsel. Any such motion filed after January 31, 2025, must meet the standards of Fed. R. Civ. P. 15 and 16."). Under Rule 15(a), within 21 days of serving a complaint, a party may amend its complaint as a matter of course. See Fed. R. Civ. P. 15(a)(1). Other amendments are allowed "only with the opposing party's written consent or the court's leave," although "[t]he court should freely give leave when justice so requires." Id. at 15(a)(2). Once a district court has issued a scheduling order, the scheduling order "may be modified only for good cause." Id. at 16(b)(4).

20

"Given their heavy case loads, district courts require the effective case management tools provided by Rule 16." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008).[2] A trial court's scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." Gestetner Corp. v. Case Equip. Co., 108 F.R.D. 138, 141 (D. Me. 1985). "[T]he terms of the [scheduling] order must be firmly and fairly enforced by the district judge if it is to serve the purpose of pretrial management designed 'to secure the just, speedy, and inexpensive determination of every action.'" Barwick v. Celotex Corp., 736 F.2d 946, 954–55 (4th Cir. 1984) (quoting Fed. R. Civ. P. 1).

"[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." Nourison Rug Corp., 535 F.3d at 298; see Page v. Bragg Communities, LLC, No. 5:20-CV-336, 2023 WL 4166454, at *3 (E.D.N.C. June 23, 2023) (unpublished); Taveney v. Int'l Paper Co., No. 4:19-CV-103, 2022 WL 909403, at *2–3 (E.D.N.C. Mar. 28, 2022) (unpublished); United States v. $297,638.00 in U.S. Currency, No. 4:16-CV-254, 2018 WL 2124088, at *1 (E.D.N.C. May 8, 2018) (unpublished); McMillan v. Cumberland Cnty. Schs., No. 5:14-CV-344, 2016 WL 5660243, at *4 (E.D.N.C. Sept. 29, 2016) (unpublished); Velasquez v. Salsas & Beer Rest., Inc., No. 5:15-CV-146, 2016 WL 3339488, at *2 (E.D.N.C. June 13, 2016) (unpublished); Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105, 2011 WL 4527382, at *8 (E.D.N.C. Sept. 28, 2011) (unpublished); Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc., No. 5:06-CV-160, 2011 WL 1262159, at *1–2 (E.D.N.C. Mar. 31, 2011) (unpublished), aff'd, 477 F. App'x 981 (4th Cir. 2012) (per curiam) (unpublished). "If the party fails to establish 'good cause' under Rule 16, a trial court may deny

---

[2] The court has over 1,500 pending cases.

the motion to amend and need not conduct the inquiry under Rule 15." Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8.

Rule 16's "good cause" standard turns on "the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party." Montgomery v. Anne Arundel Cnty., 182 F. App'x 156, 162 (4th Cir. 2006) (per curiam) (unpublished); see Nourison Rug Corp., 535 F.3d at 298; Essential Housing Mgmt., Inc. v. Walker, No. 97-2150, 1998 WL 559349, at *4 (4th Cir. June 9, 1998) (per curiam) (unpublished) (Rule 16 "primarily considers the diligence of the party seeking to amend, rather than simply that party's lack of bad faith or the lack of prejudice to the opposing party."); Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8; Farrar & Farrar Dairy, Inc., 2011 WL 1262159, at *2. Establishing good cause requires the moving party to show that the party could not reasonably have met the deadline despite the party's diligence. See, e.g., Cook v. Howard, 484 F. App'x 805, 815 (4th Cir. 2012) (per curiam) (unpublished); United States v. Godwin, 247 F.R.D. 503, 506 (E.D.N.C. 2007).

Software Automation assigned its interests in BPP and its rights to defend the copyright to IIP Holdings more than seven months before it filed its complaint. Compare Compl. 1 (filed March 3, 2023), with [D.E. 48-12], and [D.E. 48-13]. Software Automation refers to IIP Holdings as its "parent company," [D.E. 53] 4, and the Bornheimer assignment occurred just 24 hours before Software Automation executed the MIPA with IIP Holdings. This case is more than two years old. The court and defendants have spent considerable time and resources on this case. Now, at the close of fact discovery and after months of resisting defendants' requests for discovery, Software Automation casually reveals that it "is the former owner of BPP." [D.E. 53] 6 (emphasis added). Software Automation's excuses for its negligence strain credulity.

22

Software Automation's failure to reveal that it does not own BPP or its associated intellectual property is not an understandable mistake under Rule 17. Software Automation should have known when it filed this action that it assigned its interests to IIP Holdings seven months earlier. Moreover, in light of Software Automation's failure to sufficiently justify its delay in seeking to amend the complaint or the scheduling order, its lack of diligence, and its apparent obfuscation, Software Automation fails to show good cause for its proposed amendment under Rule 16.[3] Accordingly, the court denies Software Automation's motion to amend the scheduling order or its complaint to join IIP Holdings as plaintiff. Even if Software Automation has Article III standing to pursue counts three, four, and eight, Software Automation is not the real party in interest for its federal claims. Thus, the court dismisses counts three, four, and eight.

In opposition, Software Automation cites Martineau v. Wier, 934 F.3d 385 (4th Cir. 2019) and argues that "legal ownership of causes of action is not dispositive of Article III standing." [D.E. 68] 5 (emphasis in original). According to Software Automation, Martineau establishes that, although a plaintiff may lack an ownership interest in a claim, a plaintiff may nonetheless have Article III standing to pursue that claim. See id. at 5–7. Defendants distinguish Martineau based on its facts. See [D.E. 65] 14–15.

---

[3] Software Automation argues that it need not satisfy Rule 16's "good cause" standard to amend its complaint in light of its motion under Rule 17(a)(3). See [D.E. 68] 10–11. In support, Software Automation cites Harrison v. Forde, 594 F. Supp. 3d 1291, 1299–301 (S.D. Ala. 2022). In Harrison, the court held that "a plaintiff who satisfies Rule 17(a)(3) necessarily satisfies Rule 16(b)(4)." Id. Software Automation, however, does not satisfy Rule 17(a)(3). Thus, the court need not address whether it agrees with the Harrison court's questionable conclusion about the relationship between Rule 17(a)(3) and Rule 16(b)(4).

Alternatively, this court's scheduling order binds Software Automation and required motions to amend pleadings made after January 31, 2025, to satisfy Rule 16's "good cause" standard. See [D.E. 39] 2. Accordingly, the court rejects Software Automation's arguments concerning Harrison.

In Martineau, the Fourth Circuit recognized the difference between Article III standing and whether a plaintiff is the real party in interest to pursue a claim. See Martineau, 934 F.3d at 391. In Martineau, Martineau had tort claims and then filed for bankruptcy. See id. The tort claims then became property of the bankruptcy estate, and the trustee became the real party in interest for those tort claims. See id. The trustee later abandoned those tort claims, "bringing them outside the bankruptcy estate." Id. at 392. Under those circumstances, the Fourth Circuit held that "bankruptcy law treats [plaintiff] as having owned the claims continuously." Id. (quotation omitted) (emphasis added).

Martineau is distinguishable. Here, the claims did not initially belong to Software Automation, but to Bornheimer. On July 27, 2022, Bornheimer assigned the claims to Software Automation. In turn, on July 28, 2022, Software Automation assigned the claims to IIP Holdings. On March 17, 2023, Software Automation filed suit. On these facts, Software Automation did not own the claims when it filed suit and has never owned the claims during the pendency of the suit. Thus, Martineau provides no comfort to Software Automation.

### B.

Having analyzed Software Automation's federal claims, the court now analyzes Software Automation's state law claims in counts one, five, six, ten, and twelve. Once more, Software Automation's document production shows that Software Automation received its interests in BPP and the associated intellectual property from Bornheimer on July 27, 2022. Software Automation's complaint alleges that defendants' allegedly infringing conduct occurred before July 27, 2022. See Compl. ¶¶ 1–96.

In North Carolina, the general rule is that a cause of action "accrues as soon as the right to institute and maintain a suit arises." Williams v. Blue Cross Blue Shield of N.C., 357 N.C. 170,

24

178, 581 S.E.2d 415, 423 (2003) (citations omitted); Dickinson v. Univ. of N. Carolina, 91 F.

Supp. 3d 755, 767 (M.D.N.C. 2015); see United States v. Kubrick, 444 U.S. 111, 119 n.6 (1979);

Henderson v. United States, 785 F.2d 121, 125–26 (4th Cir. 1986); Wilkinson v. United States,

677 F.2d 998, 1000–02 (4th Cir. 1982); Fancher v. United States, 646 F. Supp. 3d 694, 700

(E.D.N.C. 2022). In other words, counts one, five, six, ten, and twelve accrued while Bornheimer

possessed the rights to BPP and its associated intellectual property. Thus, any interest or right to

legal action that Software Automation purports to have assigned to IIP Holdings on July 28, 2022,

(i.e., all claims other than its claim for breach of contract), must have first been assigned to

Software Automation by Bornheimer on July 27, 2022. Accordingly, the court initially must

determine whether Bornheimer properly assigned his interests to Software Automation before

analyzing the parties' arguments about Article III standing or Rule 17.

In counts one, five, six, ten, eleven, and twelve, Software Automation seeks relief under

North Carolina law. Accordingly, the court must predict how the Supreme Court of North Carolina

would rule on any disputed state-law issue. See Twin City Fire Ins. v. Ben Arnold-Sunbelt

Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to

opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th

Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this

court "may consider lower court opinions, . . . treatises, and the practices of other states." Twin

City Fire Ins., 433 F.3d at 369 (quotation omitted). In doing so, a federal court "should not create

or expand [a] [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-

Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (cleaned up); Wade v. Danek

Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a

state would address an issue, this court must "follow the decision of an intermediate state appellate

25

court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted).

North Carolina law controls a court's review of a purported assignment of claims. See, e.g., Skyline Restoration, Inc. v. Church Mut. Ins., 20 F.4th 825, 834 (4th Cir. 2021) (examining assignability of a UDTPA claim under North Carolina law); Am. Sur. Co. of N. Y. v. Baker, 172 F.2d 689, 691 (4th Cir. 1949) (examining assignability under North Carolina law); Alston v. Nat'l Credit Sys., Inc., No. 5:24-CV-518, 2025 WL 818562, at *2 (E.D.N.C. Mar. 13, 2025) (unpublished) (same); Jones v. Credit Control Corp., No. 4:22cv5, 2022 WL 3924215, at *3–4 (E.D. Va. Aug. 29, 2022) (unpublished) (examining assignability under Virginia law). In North Carolina, "an action arising out of a contract can generally be assigned; however, an assignment of a personal tort claim is void as against public policy because it promotes champerty." In re Buildnet, Inc., No. 01-82293, 2004 WL 1534296, at *9 (Bankr. M.D.N.C. June 16, 2004) (unpublished); see Invs. Title Ins. v. Herzig, 330 N.C. 681, 688, 413 S.E.2d 268, 271 (1992); Horton v. New S. Ins., 122 N.C. App. 265, 268, 468 S.E.2d 856, 858 (1996). The court must then examine each state law claim in Software Automation's complaint and consider whether North Carolina law permitted assignment of that claim.

Because Software Automation purports to have assigned the interests it received from Bornheimer to IIP Holdings, the court begins with the Bornheimer assignment. As explained, the relevant claims and interests accrued while Bornheimer held the rights to BPP and its associated intellectual property. Software Automation could only assign to IIP Holdings the interests it actually possessed. Thus, the court assesses the propriety of the Bornheimer assignment on a claim-by-claim basis.

26

Beginning with count one, under North Carolina law, "an action arising out of contract generally can be assigned, and the assignee may bring a breach of contract action" but not an action for tortious breach of contract. Piedmont Roofing Servs., LLC v. Massachusetts Bay Ins., 646 F. Supp. 3d 672, 673–74 (M.D.N.C. 2022); see Horton, 122 N.C. App. at 268, 468 S.E.2d at 858. In count one, Software Automation asserts a claim for defendants' alleged breach of the EULA. See Compl. ¶¶ 97–111. The EULA attached to Software Automation's complaint lists its version date as January 31, 2019. See [D.E. 1-1] 2. Bornheimer, however, did not assign his interest to Software Automation until July 27, 2022. See [D.E. 48-11]. Thus, according to Software Automation's complaint and the EULA, and in light of Software Automation's admission that it did not receive the Bornheimer assignment until July 27, 2022, defendants breached the EULA (if at all) while Bornheimer owned the copyright for BPP and its associated property. Bornheimer, not Software Automation, was party to the EULA at the time of the alleged breached. Accordingly, the breach of contract claim belonged to Bornheimer and was his to assign, and he did assign this claim to Software Automation on July 27, 2022.

On July 28, 2022, Software Automation assigned its right to sue for breach of the EULA to IIP Holdings. Software Automation, however, denies that the MIPA assigned its breach of contract claim to IIP Holdings. See [D.E. 53] 10.

The plain terms of the MIPA belie Software Automation's argument. "[T]he interpretation of an assignment is governed by rules applicable to the interpretation of a contract." Martin v. Ray Lackey Enters., Inc., 100 N.C. App. 349, 354, 396 S.E. 2d 327, 330 (1990). When contractual terms are "plain and unambiguous, a contract can be interpreted by the court as a matter of law."

Id., at 396 S.E. 2d at 330; see Mountain Fed. Land Bank v. First Union Nat. Bank, 98 N.C. App. 195, 200, 390 S.E.2d 679, 682, disc. rev. denied, 327 N.C. 141, 394 S.E.2d 178 (1990).

The court has reviewed the record, the parties' arguments, and the MIPA. As explained, the MIPA makes clear Software Automation's intention to assign all its interests in BPP and its associated intellectual property to IIP Holdings. The MIPA does not support Software Automation's argument that it intended to keep its breach of contract claim. To the contrary, the MIPA indicates that Software Automation assigned to IIP Holdings all rights, title, and interest to all of Software Automation's intellectual property and related causes of action. Sections K, L, and M of the MIPA broadly define the scope of Software Automation's assignment of intellectual property to IIP Holdings:

> K.) "Intellectual Property" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with or required for the exercise of, and including any and all: (a) trademarks, service marks, trade names, brand names, logos, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Entity, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media; (c) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; and (d) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing.
>
> L.) "Intellectual Property Assets" means all Intellectual Property that is owned by Zach Bornheimer or SAH and used in or necessary for the conduct of SAH business as currently conducted.
>
> M.) "Intellectual Property Registrations" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing with any Governmental Entity or private registrar.

[D.E. 48-12] 4–5. Moreover, Exhibit F to the MIPA includes the United States Copyright

28

Registration No. TX0008754771, Software Automation's interest bestplanpro.com, and all unregistered copyrights and trade secrets in BPP's software and user interfaces. See id. at 30. Section 3.9 of the MIPA establishes that Software Automation intended to assign its interests in the items contained in Exhibit F to IIP Holdings. See id. at 9. Furthermore, Section 7 of the MIPA explicitly assigns to IIP Holdings Software Automation's right to sue for defendants' alleged infringement (including the claim for breach of contract):

> 7. PATENT OUTSTANDING ISSUES. Zach Bornheimer has pending before the U.S. Patent and Trademark Office, two applications (#17739663 and #63339212) for Utility Patent Registration for "Systems & Methods for Processing Plans having Data and Conditions Applicable to a Population" and "Methods and Systems to Prevent Credential Piracy" which contain Intellectual Property utilized in the "Best Plan Pro" software, marketed by SAH. Zach Bornheimer believes that Insurance Toolkits, LLC has engaged in activities wherein Insurance Toolkits, LLC has, among other claims, infringed upon Zach Bornheimer's/SAH's trademarks, copyright, inventions and patents to market a competing product called FEXToolkit. Zach Bornheimer has engaged outside legal counsel to provide legal guidance in this matter. It is the position of Zach Bornheimer and SAH not to undertake further action against Insurance Toolkits, LLC until the U.S. Patent and Trademark Office has issued one of the patents filed by Zach Bornheimer. Outside counsel has indicated that based on information to-date, there can be a cause of action available to Zach Bornheimer and/or SAH. In accordance with the IP Assignment Agreement attached hereto as Exhibit J (the "Assignment"), the Buyer will have any rights to all such legal rights or actions against Insurance Toolkits, LLC.

Id. at 16 (emphasis added).

To recap: (1) the breach of contract claim belonged first to Bornheimer; (2) Bornheimer then properly transferred his breach of contract claim to Software Automation on July 27, 2022; and (3) Software Automation transferred its right to bring Bornheimer's breach of contract claim to IIP Holdings on July 28, 2022. Because Software Automation assigned the right to sue for breach of contract to IIP Holdings on July 28, 2022, Software Automation is not the real party in interest under Federal Rule of Civil Procedure 17 for the breach of contract claim in count one.

29

Software Automation proposes to remedy this problem by joining IIP Holdings as plaintiff under Federal Rules of Civil Procedure 15 and 17. See [D.E. 54].

As discussed, the court will not permit Software Automation to join IIP Holdings as plaintiff. Software Automation assigned its interests in BPP and its rights to pursue Bornheimer's breach of contract claim to IIP Holdings more than seven months before it filed its complaint. Compare Compl. 1 (filed March 3, 2023), with [D.E. 48-12], and [D.E. 48-13]. Software Automation's failure to reveal that it does not own BPP or the associated intellectual property cannot amount to an understandable mistake under Rule 17. Software Automation should have known when it filed this action that just seven months before it assigned its interests to IIP Holdings. Moreover, in light of Software Automation's failure to sufficiently justify its delay in seeking to amend the complaint or the scheduling order, its lack of diligence, and its apparent obfuscation, Software Automation fails to show good cause for its proposed amendment under Rule 16. Accordingly, the court denies Software Automation's motion to amend its complaint to join IIP Holdings as plaintiff. Even if Software Automation has Article III standing to pursue count one, Software Automation is not the real party in interest for the breach of contract claim. Thus, the court dismisses count one.

ii.

In counts five and six, Software Automation seeks damages and injunctive relief for defendants' alleged misappropriation of Software Automation's trade secrets in violation of the TSPA. See Compl. ¶¶ 135–51. Like its other claims, Software Automation would have received its ability to bring counts five and six from Bornheimer on July 27, 2022. Software Automation admits that it assigned its ability to pursue counts five and six to IIP Holdings via the MIPA on July 22, 2022. See, e.g., [D.E. 55-4] ¶¶ 124–39. The court has not located any case in which a

30

North Carolina appellate court either allowed or prevented a party from assigning a claim under the TSPA to a third party. Thus, the court assumes without deciding that North Carolina law permitted Bornheimer to assign counts five and six to Software Automation on July 27, 2022, and that Software Automation properly assigned its ability to pursue counts five and six to IIP Holdings via the MIPA on July 28, 2022. See [D.E. 48-11]; [D.E. 48-12].

Software Automation is not the real party in interest under Federal Rule of Civil Procedure 17 for counts five and six. Instead, IIP Holdings is the real party in interests for counts five and six. As explained, however, the court will not permit Software Automation to join IIP Holdings as plaintiff because Software Automation fails to satisfy either Rule 17's understandable mistake standard of Rule 16's good cause requirement. Accordingly, even if Software Automation has Article III standing to pursue counts five and six, the court dismisses counts five and six.

iii.

In counts ten and twelve, Software Automation asserts a claim under the UDTPA and for fraud in violation of North Carolina law. See Compl. ¶¶ 195–99, 206–14. Software Automation's complaint and admission that it did not receive the Bornheimer assignment until July 27, 2022, establishes that these causes of action accrued while Bornheimer (not Software Automation) owned BPP and its related intellectual property. Thus, counts ten and twelve were Bornheimer's to assign, and he purports to have done so on July 27, 2022.

North Carolina law "prohibits assignment of personal tort claims in general." Alston, 2025 WL 818562, at *3. Tort claims such as unfair and deceptive trade practices, personal injury, bad faith refusal to settle, breach of fiduciary duty, and tortious breach of contract are personal to a plaintiff and cannot be assigned. See Herzig, 330 N.C. at 413, S.E.2d at 271–72 (invalidating assignment of claims for unfair trade practices); Terrell, 131 N.C. App. at 660, 507 S.E.2d at 926

31

(invalidating assignment of claim for tortious bad faith); Horton, 122 N.C. App. at 269, 468 S.E.2d at 859 (purported assignment of claims for unfair and deceptive practices, had faith refusal to settle, breach of fiduciary duty, and tortious breach of contract is void). Thus, North Carolina law voids Bornheimer's purported assignment of counts ten and twelve to Software Automation on July 27, 2022.

Once again, Software Automation is not the real party in interest under Federal Rule of Civil Procedure 17 for counts ten or twelve. Importantly, because Software Automation could not assign rights that it never had, IIP Holdings is not the real party in interest under Rule 17 either. Instead, counts ten and twelve belong to Bornheimer and North Carolina law voids his attempt to transfer his rights to the accrued causes of action on July 27, 2022. At bottom, Software Automation never held the right to pursue counts ten and twelve and, by extension, neither did IIP Holdings. Moreover, Software Automation lacks Article III standing to pursue counts ten and twelve because those claims were "never validly assigned." Alston, 2025 WL 818562, at *3; see Jones, 2022 WL 3924215, at *4. Thus, the court dismisses counts ten and twelve for lack of subject-matter jurisdiction.

The court has dismissed all of Software Automation's claims. Defendants have a remaining counterclaim for libel per se against Software Automation. Not later than July 18, 2025, defendants shall either submit briefing establishing that the court has jurisdiction over the counterclaim or move to voluntarily dismiss their counterclaim.

### III.

In sum, the court GRANTS defendants' motion to dismiss the complaint [D.E. 47], DENIES plaintiff's motion to file an amended complaint to join IIP Holdings, and DENIES AS MOOT plaintiff's request for an extension of time to file opening expert reports [D.E. 77]. Not

later than July 18, 2025, defendants shall either submit briefing establishing that the court has jurisdiction over the counterclaim or move to voluntarily dismiss their counterclaim.

SO ORDERED. This 3 day of July, 2025.

James C. Dever III
JAMES C. DEVER III
United States District Judge